IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CARLINE CRAWFORD,

    Plaintiff,

v.                                                                     No. 04-2720 B

MUVICO THEATERS, INC.,

    Defendant.

_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

INTRODUCTION

On September 13, 2004, the pro se Plaintiff, Carline Crawford, initiated this action against the Defendant, Muvico Theaters, Inc. ("Muvico"), alleging employment discrimination based on race and sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.  In the instant motion, the Defendant seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

STANDARD OF REVIEW

Rule 56 states in pertinent part that a

> . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56©; see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on her pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S.Ct. at 2553.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. at 1356.  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  The "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## FACTS

At the outset, the Court notes that, in an order entered January 27, 2006, Magistrate Judge Tu Pham granted the motion of the Defendant to strike certain letters attached to Plaintiff's response to the motion for summary judgment.  Inasmuch as Plaintiff did not object to the magistrate judge's order, these documents will not be considered by the Court herein.  Also, the Defendant points out in its reply that the Equal Employment Opportunity Commission (the "EEOC") concluded that it did not discriminate against Crawford.  However, an EEOC determination is not binding on the trier of fact in a discrimination action and, thus, has no bearing on the Court's determination on the merits of the Plaintiff's case.  See Lindsey v. Prive Corp., 161 F.3d 886, 894 (5th Cir. 1998).

The following material facts are undisputed unless otherwise noted.  Crawford, a black female, was hired by Muvico on April 18, 2002 as a concession worker cashier at its Peabody Place

Mall location in Memphis, Tennessee. In June or July 2003, the Plaintiff was promoted to a coordinator, a supervisory position in which she was responsible for the concession area and condiment stand. She remained in this position until she was terminated on April 1, 2003. As a coordinator, Crawford's duties included assisting with customer complaints; opening, setting up and closing the concession area; stocking; cleaning; training newly hired cashiers; and ensuring that all cashiers performed their assignments properly. In the event it was necessary for a cashier to void a customer transaction, a coordinator or, if one was not available, a manager, was required to perform the task.

When Crawford was hired, she received a copy of Muvico's employee handbook and executed an Employee Acknowledgment Form agreeing to comply with the Defendant's policies. Employees were permitted a 30-minute break (or two 15-minute breaks) and a 30-minute lunch daily. The Plaintiff was also made aware of the employer's uniform policy, that required employees to wear black pants, a shirt, which was to be worn tucked in, and a vest. On February 28, 2003, floor staff members, including Crawford, were provided with a memorandum stating, in part, that "[w]hen you arrive for work, when you are on break and until you leave the premises once you clock out, you are expected to look professional and neat. . . . Your shirt must be tucked in . . ." The coordinators were responsible for ensuring employees under their supervision followed the policy. The memorandum further advised that failure to follow the uniform policy "may result in disciplinary action." On March 31, 2003, coordinators were again reminded of the uniform policy.

On March 17, 2003, Crawford received a written warning for failure to make certain documentations in the employee schedule book. She signed the warning indicating that she "[understood] that future violations may be cause for [her] discharge." Generally, the Plaintiff

worked from shortly before noon until 6:00 p.m. Beginning sometime in November or December, 2002, the Plaintiff was approved by her supervisors to leave work during her shift in order to pick up her son from school. According to Crawford, this information was passed on to Herb Sayas and Richard Keenan, who entered Muvico's chain of command after the approval had been granted. The Plaintiff has averred that she was permitted to leave the theater so long as another supervisor or coordinator was willing to sit behind the concession desk in her absence. If no one was available, Crawford was expected to inform a manager that she had to leave. After picking up her child, she would take him to daycare and return to work.

At the time the Plaintiff needed to pick up her son on the date of her termination, she was the only coordinator supervising the concession and condiment areas and the three employees stationed there. The only other supervisor on duty at the time was Chris Townsend, who was responsible for ushering and not assigned to concessions. As the movies had begun by that point, Crawford asked Townsend if he could stay in the concession area until she returned. He agreed to do so. She does not deny that she then left the premises without advising anyone in management.

In returning to work, the taxicab in which the Plaintiff was riding became stuck in traffic, resulting in a one hour and 17 minute absence from the theater. Often the trip took longer than an hour and 17 minutes, particularly if she rode the bus instead of a taxi. When she arrived, Townsend had left the concession area for guest services to relieve another employee for a restroom break. Keenan was also in guest services. The Defendant maintains that, while Crawford was out, two transactions had to be voided. Keenan responded to both requests for assistance, noting that no coordinator was present and having been advised that the Plaintiff was at lunch. He further observed that she had been absent from work for more than an hour. Crawford, on the other hand, insists

4

Keenan knew she had left to pick up her son, as she did nearly every other day, and that he purposely removed Townsend from the concession area to guest services to make it look as if she had left her post unattended. She also denied that Keenan was told she was "at lunch."

As Crawford ran into the theater building, her shirttail was out, a fact that did not go unnoticed by Keenan. She went to the concession stand, tucked her shirt in, put on her vest and clocked in. The Plaintiff was then advised by another employee that Keenan wanted to speak with her in his office. Once she was in the office, Crawford claims that he began shouting at her. She reminded him that she was picking up her son and explained that she did not call to tell him she was running late because there was no available telephone in the taxicab. The Plaintiff also alleges that she pointed out to Keenan her previous requests for a shirt in a smaller size. Crawford recalled that when she asked whether she was being disciplined for having her shirttail out, she was told that she would be written up for leaving the building. According to the termination document signed by the Plaintiff, she was discharged for "unreported absence[,] leaving without permission [and] failure to obey orders." The stated reason for the employer's conclusion was as follows:

> Carline left the building for 1 [hour] 17 [minutes]. Carline did not have permission to leave by any manager. When she returned to the building, she was observed by Richard Keenan in violation of the uniform policy. On 3/31/03, during the coordinator's meeting, the entire coordinator staff was advised of the uniform policy and enforcement of such.

## ANALYSIS OF THE PARTIES' CLAIMS

Crawford contends in this action that white male employees, without repercussion, left the building while on break and that they were present inside the theater premises with shirts untucked. She further averred in her affidavit that Keenan told her he did not want her "type working for him." Finally, the Plaintiff claims that Keenan treated white workers differently from black workers, based

on an incident that occurred at the concession stand about a month prior to her termination. Crawford submits that a white male employee was asked by two black female customers for a small popcorn. He replied that they were "too old to buy the small popcorn" and recommended they purchase a larger size. The customers brought it to Crawford's attention and she alerted Keenan, who told them he would "take care of it." When he failed to do anything more than laugh and talk with the employee as if nothing had occurred, she complained to Keenan that, if a black employee had insulted white customers, the employee would have been fired on the spot. According to the Plaintiff, Keenan replied, shouting, that she should find something to do before he fired *her*.

Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race [or] sex . . ." 42 U.S.C. § 2000e-2(a)(1). Disparate treatment as posited by the Plaintiff "occurs when an employer treats some employees less favorably than others because of race, religion, sex, or the like." Huguley v. Gen. Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995). Crawford may withstand the motion for summary judgment either by presenting direct evidence of discrimination or by presenting circumstantial evidence, utilizing the evidentiary framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), from which a jury could draw an inference of discriminatory motive. See Seay v. Tenn. Valley Auth., 339 F.3d 454, 463 (6th Cir. 2003).

With respect to direct evidence, the Sixth Circuit has explained as follows:

Where a plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination. This court has explained that

6

>       direct evidence is that evidence which, if believed, requires the conclusion that
>       unlawful discrimination was at least a motivating factor in the employer's actions.
>       Consistent with this definition, direct evidence of discrimination does not require a
>       factfinder to draw any inferences in order to conclude that the challenged
>       employment action was motivated at least in part by prejudice against members of
>       the protected group.

Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003), reh'g and suggestion for reh'g en banc denied (Apr. 22, 2003) (internal citations and quotation marks omitted). Thus, upon a showing by a plaintiff of credible direct evidence of discriminatory animus, the employer must "do more than merely 'articulate' its nondiscriminatory reason for its action." Brack v. Shoney's, Inc., 249 F.Supp.2d 938, 947 (W.D. Tenn. 2003), reconsideration denied, No. 01-CV-2997-DV, 2003 WL 23924996 (W.D. Tenn. Mar. 27, 2003).

Where direct evidence is not available, as is the case here, a plaintiff may, utilizing the McDonnell Douglas/Burdine analysis, create an inference of discrimination based on introduction of evidence supporting a prima facie case of discrimination based on race or sex, that is: "(1) [she] was a member of a protected class; (2) [she] suffered an adverse employment action; . . . (3) [she] was qualified for the position from which [she] was discharged" and (4) that [she] "was either replaced by someone outside the protected class or treated differently than similarly situated, non protected employees." Noble v. Brinker Int'l, Inc., 391 F.3d 715, 728 (6th Cir. 2004), cert. denied, ___ U.S. ___, 126 S.Ct. 353, 163 L.Ed.2d 62 (2005). Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions. McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. at 1824. If the employer carries its burden of production, the presumption raised by the plaintiff's prima facie case is rebutted. A plaintiff must then prove, by a preponderance of the evidence, that the employer's stated reasons for the employment action were a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 518-19, 113 S.Ct. 2742, 2753-54, 125 L.Ed.2d 407 (1993).

It is undisputed that Crawford is a member of a protected class and that she suffered an adverse employment action. The Defendant argues, however, that she has failed to establish a prima facie case as to the remaining two prongs. The Court will first consider whether there is a genuine issue of material fact that the Plaintiff was qualified for the position she held at the time of her termination. The Defendant posits that Crawford was not qualified for her position because she was not performing her job at a level which met her employer's legitimate expectations, based solely on the incident resulting in her termination.

Indeed, the Defendant is correct that a plaintiff meets the qualification prong of the prima facie case "by showing that she was performing 'at a level which met her employer's legitimate expectations.'" See Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 658 (6th Cir. 2000), reh'g and suggestion for reh'g en banc denied (May 4, 2000) (citing McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990)). However, a review of the Sixth Circuit's decision in Cline reveals the fatal flaw in Muvico's position.

Cline was a teacher at a parochial school who, during her tenure, became pregnant outside of marriage. Id. at 655-56. Her employment was governed by a contract and an "Affirmation" under which she was to "reflect the values of the Catholic Church" by "word and example" and which incorporated the teacher handbook's mission statement that the school was to "instill in our children the Gospel message of Jesus Christ." Id. at 656. The defendant declined to renew her contract for the school year after she became pregnant because she "became pregnant before she got married." Id. The district court granted the defendant summary judgment in the resulting discrimination lawsuit on the grounds that she failed to make a prima facie case as to the qualification prong. Id. at 659. Specifically, the court determined that "[b]y engaging in premarital sex, she had violated both the Contract and the Affirmation, and her promise under them to 'live according to the

8

principles of the Catholic Church.' *Her own actions therefore rendered her unqualified for the teaching position.*" Id. (internal citations omitted) (emphasis added).

On appeal, the Sixth Circuit found that the district court had misapplied the McDonnell Douglas test. In doing so, the court recognized that the prima facie case "is not onerous[,] . . . merely serves to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons for the employer's treatment of the plaintiff, [and] is only the first stage of proof in a Title VII case." Id. at 660 (internal citations omitted). The court went on to find as follows:

> The district court ignored these precepts when it held that Cline failed to make a prima facie showing. In addition to setting a burden far too high, it conflated the distinct stages of the McDonnell Douglas inquiry by using [the defendant's] "nondiscriminatory reason" as a predicate for finding Cline to have failed to make a prima facie case. The court found Cline "unqualified" under prong [three] of the prima facie case because she had not lived up to the promises she made to "exemplify the moral values taught by the Church." Because her pregnancy due to premarital sex meant that "she no longer met all the qualifications of her position," even strong evidence as to her satisfactory performance (i.e., her evaluations and teaching record) could not overcome these moral failings. This analysis improperly imported the later stages of the McDonnell Douglas inquiry into the initial prima facie stage. As discussed *infra*, [the defendant] alleges that it did not renew Cline's contract because she violated its premarital sex policy, which constituted part of the broader ministerial requirements of being a . . . teacher; conversely, Cline argues that this rebuttal is a pretext for discrimination. Rather than resolve this debate at the prima facie stage, McDonnell Douglas requires that the district court consider this dispute at the inquiry's third stage, when its role is to decide the "ultimate question" of discrimination. In other words, when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff.

Id. at 660-61 (internal citations omitted). In this case, Muvico makes a similar attempt to impermissibly conflate the McDonnell Douglas paradigm by using its reason for firing Crawford as a predicate for arguing that she was not qualified for her job. See White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 242 (6th Cir. 2005) (taking note of the Sixth Circuit's warning "against

9

conflating the first (prima facie case) and second (articulation of a legitimate nondiscriminatory reason) steps in the McDonnell Douglas analysis," citing Cline and Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 584-85 (6th Cir. 2002)).

Judging the evidence independent of the stated reason for the termination and in the light most favorable to the Plaintiff, the Court finds there is sufficient evidence in the record for a reasonable jury to conclude that she was qualified for her position. After a little more than a year as a cashier, she was promoted to a supervisory position. With respect to the warning she received concerning failure to document employee presence/absence in the schedule book, it is Crawford's assertion that the coordinators could not locate the book where Keenan told them it was and that all of the coordinators were written up. She signed the warning sheet simply because everyone else did. Evidence was also presented involving an incident in which Crawford left work when her baby, who was in the theater's playroom, suffered an asthma attack. Although the incident apparently resulted in an "unreported absence," she was not disciplined. At bottom, while her record may not have been perfect, there is nothing to suggest the Plaintiff did not possess the basic skills to perform her duties as coordinator and the Defendant has offered no challenge as to those basic skills. Accordingly, she has cleared the low bar for establishing that she was qualified for the position she held. See EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1193-94 (10th Cir. 2000) (holding it inappropriate at prima facie stage to consider defendant's proffered reason when determining whether plaintiffs were qualified; rather, plaintiffs need only produce some evidence they possessed basic skills necessary to perform the job, to which employer had offered no challenge).

The Court now turns to the fourth prong of the prima facie case--that is, whether Crawford was "replaced by someone outside the protected class or treated differently than similarly situated, [non-protected] employees." See Noble, 391 F.3d at 728. The Defendant argues that the Plaintiff

10

was not specifically replaced by anyone and that the individuals she identified as being similarly situated were in fact not. Moreover, Muvico has submitted the declaration of Keenan, in which he stated that, subsequent to Crawford's termination, a white male was terminated for taking an unapproved extended lunch break.

Since Crawford has not alleged that she was replaced by a person outside the protected class, she must, in order to survive summary judgment, demonstrate she was treated differently from similarly situated employees outside the protected class. See id. As the Sixth Circuit recently explained in Clayton v. Meijer, Inc., 281 F.3d 605 (6th Cir. 2002),

> it is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated *in all respects*. . . . [T]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated"; rather the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects." . . . [T]his Court has asserted that in applying the standard that plaintiff must show that [she] is treated differently than similarly situated employees from outside the class courts should not demand exact correlation, but should instead seek relevant similarity.

Clayton, 281 F.3d at 610-11 (internal citations and quotation marks omitted) (emphasis in original).

Crawford has alleged that five white males, Michael Cole Huff, Jason Young, Justin Young, Tyler Overman and Brian Hamilton, left the building during their break and were not fired or disciplined. She stated in her deposition that Huff and the Youngs left the building while on break to "go buy food from other places out of the building, and stuff, and whatever else they do." (Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 2 (Dep. of Carline Crawford ("Crawford Dep.") at 142.)) During her deposition, counsel posed the following query, to which the Plaintiff responded:

> Q:   . . . do I understand you to say that you're not claiming they were gone for an extended break? You're claiming they just left the building?
>
> A:   Yes, while on break.

(Crawford Dep. at 142.) Overman left the building during break "one time, but he came right back." (Crawford Dep. at 174.) She recalled that Hamilton exited the theater on break but offered no details. (Crawford Dep. at 174-75.)

The Plaintiff further charged in her deposition that three of these employees, Huff and the Young brothers, were also not disciplined for failing to tuck in their shirts. She reported seeing Huff, also a coordinator in the concession area, come in for his shift or from break with his shirttail out in mid-March 2003. Both Keenan and Sayas observed Huff, who spoke to them briefly and proceeded into the work area. Crawford saw Jason Young, a concession worker, with his shirt out of his pants almost daily in February or March, 2003 and recalled having to frequently remind him to tuck in the shirt and put on his necktie. According to the Plaintiff, Keenan was, at least on one occasion, in a position to observe Jason Young with the shirttail out. Like his brother, Justin Young, also a concession worker, regularly came to work with the shirt untucked and had to be admonished for dressing inappropriately by Crawford. Although it is unclear whether Keenan saw Justin Young in violation of the uniform policy, the Plaintiff has alleged that she mentioned it to Keenan during the April 1 interview. In her affidavit, filed contemporaneously with her response to the dispositive motion, the Plaintiff added that she saw Hamilton and Overman with their shirttails out but gave no details surrounding those instances.

These "comparables" are not, in the Court's view, similarly situated *in all respects* to the Plaintiff. At worst, the white males identified by the Plaintiff sometimes arrived at work or from break with shirts untucked and sometimes left the theater premises while on their scheduled break, which did not exceed the time permitted under Muvico policy or, if so, by only a few minutes.[1]

---

[1] It does not appear Muvico employees were actually prohibited from leaving the theater property during breaks. The discharge document does not reflect that she was fired simply for *leaving* the building and the Defendant has averred as much. However, Crawford testified in her deposition that Scott Brisco entered Keenan's office during the April 1 discussion with a write-

There is no evidence they were ever away from their posts for a period of time far exceeding the 15- or 30-minute break period, leaving no one to take their place, whether intended or not, *and* then arriving back at work out of proper uniform. The difference is essentially one of degree and combination, of which the Court is permitted to take note. See Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 562 (6th Cir. 2004), reh'g en banc denied (Feb. 1, 2005) ("although the co-workers to which [plaintiff] compares himself may have similarities in some respects, none was similar in the way that is fundamental to this case: no employee violated the key policy *and* engaged in threatening and violent behavior. Because none of the employees cited allegedly engaged in the range of activities for which [plaintiff] was disciplined, no employee is similarly situated"); Clayton, 281 F.3d at 610-12 (even though white employees engaged in the same negligent conduct, they were not similarly situated with black plaintiff whose conduct was "qualitatively more serious"); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998), reh'g and suggestion for reh'g en banc denied (Oct. 19, 1998) ("to be deemed 'similarly-situated' in the disciplinary context, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"); Bigham v. Health Express, Inc., 346 F.Supp.2d 942, 946 (E.D. Mich. 2004) ("The Court finds no evidence that a white employee had the same quantity or quality of deficiencies and was treated any better. While there may have been other employees who made personal telephone calls, there is no evidence of another employee who had the same combination or extent of deficiencies and was treated differently"). Based on the

---

up form. According to her testimony, she asked him if he was writing her up for having her shirt out and he replied, "No, I'm writing you up for leaving the building." (Crawford dep. at 84.) Based on the Court's decision herein, however, it need not address whether leaving the premises was permitted.

foregoing, the Court finds that the Plaintiff has failed to establish the fourth prong of the prima facie case for discrimination under Title VII.

Even if she had satisfied her burden by making the required showing, however, the Defendant has offered a legitimate, nondiscriminatory reason for her discharge, that is, absence from work without proper authorization or notification to management and failure to comply with the uniform policy. At this point, Crawford must demonstrate, by a preponderance of the evidence, that Muvico's stated reasons for firing her were a pretext for discrimination. See Hicks, 509 U.S. at 518-19, 113 S.Ct. at 2753-54. In doing so, she "must introduce admissible evidence to show 'that the proffered reason was not the true reason for the employment decision' and that racial animus was the true motivation driving the employer's determination." Barnes v. United Parcel Serv., 366 F.Supp.2d 612, 616 (W.D. Tenn. 2005) (citing Hicks, 509 U.S. at 508, 113 S.Ct. 2742). Pretext may be shown by evidence that the defendant's stated reason had no basis in fact, did not actually motivate the decision or was not sufficient to motivate the employer's action. See Manzer v. Diamond Shamrock Chem. Co. 29 F.3d 1078, 1084 (6th Cir. 1994), reh'g and suggestion for reh'g en banc denied (Sept. 22, 1994). "[E]stablishing that the employer's reason was a pretext requires that a plaintiff do more than simply impugn the legitimacy of the asserted justification; in addition, the plaintiff must also adduce evidence of the employer's discriminatory animus." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 (6th Cir. 1994). As the Supreme Court observed in Hicks,

> Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of . . . race [or sex]. That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race [or sex] is correct.

Hicks, 509 U.S. at 523-24, 113 S.Ct. at 2756. That is, "it is not enough . . . to *dis*believe the

14

employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000) (citing Hicks, 509 U.S. at 519, 113 S.Ct. 2742) (emphasis in original).

First, the undisputed evidence reveals that Muvico's stated reason for firing Crawford had a basis in fact, as she admitted being absent from the premises for over an hour, failing to advise a manager that she was leaving, and returning with an untucked shirt. Moreover, even though she may have intended it to be otherwise, the Plaintiff does not dispute that there was no coordinator in the concession area when she appeared back at work.

Further, Crawford's references to racial and/or gender bias are unavailing. Clearly, racial or gender slurs or comments may constitute direct evidence that a termination was discriminatorily motivated. Norbuta v. Loctite Corp., 1 F.App'x 305, 312 (6th Cir. 2001). However, Crawford has not claimed in this case that she ever heard Keenan or anyone else at Muvico make derogatory statements about women or blacks. In addition, Keenan's alleged statement that he did not want "her type" working for him does not, in this Court's view, rise to the level of being actionable. According to her affidavit, "Mr. Keenan told [her] that he didn't want [her] type working and that [she] challenge[d] his authority." Taken in context, there is nothing to suggest the statement referred to her race or sex at all, but, rather, her attitude.

Crawford's subjective opinion that rudeness to black female customers was permitted by management while the same behavior would not have been tolerated if directed at white moviegoers is also simply insufficient to withstand summary judgment. Even viewing the incident in the light most favorable to Crawford, there is no evidence whatsoever that either the comment or Keenan's reaction had anything to do with the customers' race or sex. "[A] plaintiff's personal beliefs, conjecture and speculation as to the defendant's motivation," even if truly believed by the plaintiff,

do not constitute competent evidence. Nor do unsupported conclusory allegations. Marthel v. Bridgestone/Firestone, Inc., 926 F.Supp. 1293, 1300 (M.D. Tenn. 1996); see also Giles v. Norman Noble, Inc., 88 F.App'x 890, 895 (6th Cir. 2004) ("conclusive allegations, hearsay, and subjective beliefs regarding racial bias" on the part of the defendant insufficient to establish pretext). Finally, the Court has previously rejected herein the Plaintiff's contention that the stated reason was not sufficient to motivate the Muvico's action.

While sympathetic to Crawford's plight, the Court recognizes that "[t]he employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." See Woodbury v. Sears, Roebuck & Co., 901 F.Supp. 1560, 1565 (M.D. Fla. 1995) (citation omitted). As a district court in this Circuit has reflected,

> Tennessee is an employment-at-will state. . . . Consequently, the Court's role is not to determine whether an employer's decision to fire an employee was wise, right or otherwise. An employee may allege he has been subjected to a great deal of mistreatment by a supervisor. This Court does not condone such behavior; yet, even assuming the allegations of poor treatment by one's employer are true, a court has no role in curing those wrongs unless the employer's actions violate the law.

Anderson v. Mead Johnson Nutritional Group, Bristol-Myers Squibb Co., 910 F.Supp. 376, 380 (E.D. Tenn. 1996), aff'd, 107 F.3d 870 (6th Cir. 1997). Stated differently, while firing her for leaving work in the middle of her shift to pick up her son when she thought she had made proper arrangements to have her post covered and for failing to tuck in her shirttail in her rush to get back to work may have been patently unfair or even morally unjust, unless Keenan turned a blind eye when white and/or male employees did the same thing, his action was not a violation of Title VII. At worst, this case involves sex- and race-neutral animosity between Keenan and the Plaintiff. See Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 457-58 (6th Cir. 2004) (sex-neutral animosity between plaintiff and supervisor not sufficient to support a Title VII claim).

16

## CONCLUSION

For the reasons articulated herein, the Defendant's motion for summary judgment is GRANTED, any and all motions remaining pending in this case are DENIED as moot, the Clerk of Court is directed to enter judgment on behalf of the Defendant, and the Case Manager is directed to remove any and all settings in this matter from the Court's calendar.

IT IS SO ORDERED this 2nd day of March, 2006.

        s/ J. DANIEL BREEN
        UNITED STATES DISTRICT JUDGE